## A F F I D A V I T

STATE OF WEST VIRGINIA

COUNTY OF PUTNAM, to-wit:

I, Sean McNees, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since January 2016. I am currently assigned to the ATF Louisville Field Division, Charleston, WV Field Office.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a white in color Motorola Cellular Telephone, more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

3. The contents of Attachment "A," and Attachment "B," to this Affidavit and application for a search warrant are hereby incorporated by reference.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.

5. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

### STATUTORY AUTHORITY

6. This investigation concerns alleged violations of Title 18, U.S.C. § 922 (g)(9) – Possession of a firearm after a conviction for the misdemeanor crime of domestic violence and Title 18 U.S.C § 922(k)- Possession of a firearm with an obliterated serial number.

### AFFIANT'S TRAINING AND EXPERIENCE

7. I graduated from the Federal Law Enforcement Training Center, where I learned basic criminal investigation techniques. In addition, I graduated from the ATF National Academy, where I learned about federal firearms laws, federal explosives laws, bomb scene investigations, and arson investigations.

8. I have received investigative training, conducted and participated in investigations of violations of federal criminal laws, including those relating to firearms and controlled substances. These acts commonly involve the criminal use and transfer of firearms, illicit drug trafficking, acts of arson, criminal possession or use of explosives, and/or destructive devices.

9. In my current position as an ATF Special Agent assigned to the Charleston, WV Field Office, my primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws. Within that role, my job duties include, but are not limited to:

    a. Functions as a case agent, which entails the supervision of specific investigations;

    b. Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

    c. Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms;

    d. Drafting, obtaining and executing search warrants.

**AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY**

10. I am personally, and professionally, familiar with cellular telephones or mobile telephones.

11. I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communications between parties in remote locations.

12. I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

13. In addition to enabling voice communications, I know that cellular telephones now offer a broad range of functions, which include, but are not limited to: storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phones location. Cellular telephones can also be utilized to access social media and mobile banking or financial applications, such as Facebook, Instagram, Cash App, Zelle, and Venmo.

14. Based on my knowledge, training, and experience, I know that cellular phones, such as the Motorola cellular telephone described in Attachment "A," can store electronic information for long periods of time.

15. In my experience, it is common for cellular telephones possessed by individuals who illegally possess firearms, to contain evidence including call logs, text messages, stored emails, contact lists, photographs and video images of firearms,

firearm proceeds, and other information. It is also common for individuals to utilize cellular telephones to sell or obtain firearms.

16. I also know from my training and experience that the electronic memories of cellular telephones, including social media applications, have been found to contain evidence of illegal firearm possession, including communications regarding when and how an illegal firearm was obtained, who obtained the illegal firearm for the possessor, and the motivation for possessing the illegal firearm. Generally, historical data regarding the prior possession of firearms, including voice messages, text messages and contact information will be stored in the cellular telephone.

17. I also know that people who sell or possess firearms illegally frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, their property and assets with cellular telephones. They also frequently utilize cellular telephones as a way to communicate with others they have conspired with as well as with other individuals in order to purchase or sell firearms.

18. Cellular telephone capabilities sometimes include Global Positioning Systems (GPS), which calculates the device's geographical location by receiving information from GPS satellites. This includes GPS data associated with metadata in photograph and video files, and databases from applications that

use GPS data in their operation. This location information can also come from cellular towers and wi-fi networks with which the device has interacted. The records obtained from wireless network connections could give clues to a device's historical locations. By determining the physical location associated with the cellular telephone, investigators can understand the chronological and geographic context of the cellular telephone and use relating to the crimes under investigation. Such information allows investigators to understand the geographic and chronological context of the cellular telephones access, use, and events relating to the crimes under investigation.

## PROBABLE CAUSE

19. On June 23, 2023, SA McNees received information from West Virginia State Police (hereinafter "WVSP") Sgt. Morgan regarding a stolen firearm. On June 22, 2023, Branden Deer reported to the West Virginia State Police (WVSP) that a firearm had been stolen from him. He was later able to get the firearm back, but when he did so, he observed that the serial number on the firearm had been obliterated.

20. On June 23, 2023, Branden Deer was contacted by ATF SA Chittum, and he advised that the subject firearm was currently at his residence (211 Melrose Drive, Hurricane, West Virginia 25526). Branden Deer believed his brother, Brent DEER (hereinafter "DEER") had stolen the firearm from him.

21. After receiving the above information, SA McNees and SA Chittum travelled to Branden Deer's residence and made contact with Thomas Basham who advised that he was the grandfather of Branden Deer and DEER. Basham advised that he had the subject firearm and turned it over to SA Chittum. The firearm was identified as a Taurus, model Public Defender Judge Poly, .45/410 caliber revolver with an obliterated serial number.

22. DEER was not currently at the residence and Basham thought that he might be located at a residence located at 2523 Virginia Avenue, Hurricane, West Virginia 25526. A telephone number for DEER was also obtained from Basham. When asked if Basham thought that DEER was using drugs, he stated that he knew DEER used marijuana but was not sure about other drugs.

23. SA McNees, SA Chittum, and Hurricane Police Department Officer Armentrout travelled to the address provided by Basham to locate DEER. After speaking with an occupant of the residence who advised that they did not know who DEER was, SA Chittum called DEER using the telephone number provided by Basham. DEER answered and advised SA Chittum that he was currently behind the residence. DEER was then observed exiting a small outbuilding located in the backyard of the residence. SA McNees approached him and asked if he had any weapons on his person. DEER advised that he did not and consented to SA McNees patting him down for weapons. When searching his person for weapons, SA McNees observed a glass smoking pipe in

DEER's front left pocket that had burnt residue in it. The pipe was consistent with methamphetamine use. DEER advised that he did not have any narcotics on his person, and none were located. Nothing else of significance was located on his person.

24. DEER was advised that SA McNees and SA Chittum wanted to speak with him, and he agreed to go to SA Chittum's vehicle to be interviewed. DEER sat in the front passenger seat of the vehicle, and SA Chittum activated a recording device. DEER was verbally advised of his Miranda Rights and interviewed.

25. During the interview DEER admitted to stealing the subject Taurus revolver from his brother Branden Deer. DEER advised that he sold the firearm for $125.00 to a black male named "Derrick" in the area of the Jenny Lynn Apartments (75 Ada Dell Avenue, Hurricane, West Virginia 25526). DEER had previously met "Derrick" at a party and admitted to doing drugs with him. DEER stated later in the interview that he used some of the money from the sale of the firearm to purchase marijuana from "Derrick." DEER further advised that after Branden Deer learned the firearm was missing, their mother, Elizabeth Deer, got involved and was able to track down the firearm and get it back. DEER was not sure how his mother located the firearm, but he believed that she knew some of the same people that he did. DEER advised that he had not been the one that removed the serial number from the firearm and was not sure how that had happened.

26. That same day, Elizabeth Deer was interviewed at 211 Melrose Drive, Hurricane, West Virginia 25526. During the interview Elizabeth Deer advised that she found out that DEER had stolen a firearm from Branden Deer. Branden Deer told her who he thought had the firearm. Elizabeth Deer contacted this person who she identified as "Edward SOWARDS" (hereinafter "SOWARDS"). She advised that she later met SOWARDS and got the subject firearm back from him at the Walmart in Hurricane (67 Progress Way, Hurricane, West Virginia 25526). She met SOWARDS in the second row of the parking lot between 10:00 pm and 11:00 pm on June 21, 2023. SOWARDS drove a white in color Ford F-150. During the interaction, SOWARDS told her he was a "felon" and that he thought the firearm was stolen. SOWARDS handed her the firearm in a sock, and she took the firearm out of the sock and gave the sock back to him. She did not realize that the serial number on the firearm had been obliterated until later.

27. Elizabeth Deer advised that she communicated with SOWARDS through Branden Deer's Facebook account. SOWARDS' Facebook account was listed under the name of "Edward Sowards" with Facebook User ID# 100079669224025. SOWARDS had several photographs of himself on the Facebook account and had "Hurricane" listed as the place he currently lived. SA McNees observed that Elizabeth Deer had contacted SOWARDS on Wednesday June 21, 2023, at 4:57 pm and had placed two calls to him through Facebook Messenger.

28. During the interview on June 23, 2023, Elizabeth Deer agreed to conduct a recorded telephone call to SOWARDS through Facebook Messenger. Elizabeth Deer called SOWARDS, and he answered. Elizbeth Deer asked him "was those numbers off of that?" SOWARDS advised that when he had received the firearm from "Deertay" the serial number was still on the firearm. Investigators believe "Deertay" to be DEER. SOWARDS stated that when he got the firearm back from someone else, the serial number was removed. SOWARDS further advised that he had to go to someone's house to get the firearm, however when SOWARDS arrived the person was not home. SOWARDS stated that he broke into the person's residence to retrieve the firearm. Elizabeth Deer asked if SOWARDS had any additional firearms he could replace it with and he advised that he did not because he is not allowed to have a gun. Elizabeth Deer stated, in reference to the person that SOWARDS had retrieved the firearm from, "they had to know it was stolen," to which SOWARDS responded "yup."

29. It is believed SOWARDS utilized a cellular telephone on this date to answer Elizabeth Deer's call through Facebook and communicate with her.

30. SA McNees later located NCIC records for SOWARDS that showed that on or about April 20, 2012, he had been convicted of the misdemeanor crime of Domestic Battery, in violation of W. Va. Code § 61-2-28(a), in Putnam County, West Virginia. A review of

court records for that conviction showed that SOWARDS admitted to choking the victim, who was his girlfriend, during an argument and was living with the victim at the time of the offense. No records relating to any felony convictions were located for SOWARDS.

31. Based upon SOWARDS' conviction for Domestic Battery he is prohibited from possessing firearms under Title 18 U.S.C § 922(g)(9)- Possession of a firearm by a person who had been convicted of the misdemeanor crime of domestic violence.

32. Based upon SOWARDS' statements about knowing that the subject firearm had an obliterated serial number, his possession of the subject firearm was also in violation of Title 18 U.S.C § 922(k)- Possession of a firearm with an obliterated serial number.

33. On August 22, 2023, SA McNees obtained a federal search warrant for SOWARDS' Facebook account. After the warrant was executed, SA McNees located a message sent by SOWARDS on June 23, 2023, in which SOWARDS admitted to possessing the "pistol" that DEER stole.

34. On September 4, 2024, a federal Grand Jury returned a two-count Indictment against SOWARDS, and a warrant was issued for his arrest in the Southern District of West Virginia for the felony offenses of 18 U.S.C. §922(g)(9)- Possession of a firearm after conviction for the misdemeanor crime of domestic violence and 18 U.S.C. §922(k)- Possession of a firearm with an obliterated serial number.

35. In an effort to locate SOWARDS, SA McNees began utilizing an undercover Facebook account to communicate with SOWARDS. The account SA McNees communicated with was under the name of "Edward Sowards". This was the same account that SA McNees had previously conducted a search warrant on and located evidence related to the above-mentioned federal firearms violations.

36. SA McNees began communicating with SOWARDS through Facebook on September 12, 2024. The profile that SOWARDS believed he was communicating with was that of a white female. It was represented to SOWARDS that the female was moving from the Beckley, WV area to Hurricane, WV.

37. On September 17, 2024, SOWARDS was told that the female was trying to sell some firearms to make some money in order to be able to move to Hurricane. SOWARDS provided a telephone number of 304-539-4456 to contact him at and advised that he was interested in purchasing the firearms. SOWARDS was told that one of the firearms was a "Glock." He responded, "I'm really interested in the Glock". SOWARDS also requested photographs of the firearms.

38. SA McNees sent two photographs of firearms in ATF custody to SOWARDS. The first photograph was of a Glock, model 27, .40 caliber pistol, serial number XPX526. The second firearm was a Romarm/Cugir, 7.62 caliber pistol, serial number PMD-19461-20. SOWARDS offered to buy the Glock for $300.00 and asked where he

could meet to purchase the firearm. SA McNees advised that it would be Thursday morning before the female could meet with him.

39. On September 18, 2024, a photograph of another firearm in ATF custody, a Glock, model 22, .40 caliber pistol, serial number UBY923 was also sent to SOWARDS. SOWARDS responded that he wanted to purchase the firearm. SWOARDS asked if the firearms were stolen, and he was told that they were not. SOWARDS agreed to meet the following morning.

40. On September 19, 2024, ATF SA Kachine Jonese, acting in an undercover capacity, called SOWARDS at telephone number 304-539-4456. He did not answer. Several text messages were then exchanged with SOWARDS at the same number. SOWARDS asked, "Would you let both pistols go for 500". It was then agreed upon that SOWARDS would purchase the firearms for $500.00. SOWARDS was asked if he could obtain any "food" (a term commonly used to refer to heroin/fentanyl) to trade for the firearms. SOWARDS advised that he didn't have any, but he did "fuck with go" (a term commonly used to refer to methamphetamine).

41. SA Jonese, acting in an undercover capacity, placed a recorded telephone call to SOWARDS. During the call, SOWARDS advised SA Jonese that his boss was going to be giving him a ride and that his boss was the one that was going to purchase the firearms. SOWARDS advised that he and his boss were going to be in

a white in color Dodge pickup. SOWARDS agreed to meet at the McDonalds located at 312 Hurricane Creek Rd., Hurricane, WV 25526.

42. SA McNees had been in contact with Deputy United States Marshal (DUSM) Neville who was in the area of the McDonalds along with USMS Task Force Officer (TFO) Forest. At approximately 11:30 am, SA McNees observed a white in color Dodge pickup driving to the area of the McDonalds. SOWARDS was observed to be the front seat passenger. The vehicle pulled behind the McDonalds and parked. DUSM Neville and TFO Forest approached the vehicle and arrested SOWARDS. SOWARDS did not have any weapons in his possession but was in possession of the subject white in color Motorola cellular telephone.

43. The driver of the vehicle was identified as James Ruby. He was interviewed by SA McNees. During the interview he advised that he was taking SOWARDS to meet a female from Beckley who had some firearms for sale. Ruby intended to purchase two (2) Glock pistols and had U.S. currency on his person to do so.

44. SOWARDS was also interviewed by SA McNees. Prior to questioning SOWARDS, SA McNees activated a recording device. SOWARDS was then verbally advised of his Miranda rights. SA McNees explained to SOWARDS that he had been arrested for having a Taurus firearm approximately one year ago. SOWARDS confessed to having the firearm and stated that he had given it back. When asked about who had removed the serial number from the firearm, SOWARDS advised

"it was like that whenever he gave it to me." SOWARDS advised he obtained the firearm from DEER.

45. When asked about what he was showing up today for, SOWARDS stated he was not the one that was going to buy the firearms but was going to look at them for his friend. SOWARDS stated that he was only going to look at the firearms but did not have any money to purchase them.

46. SA McNees explained that he intended on doing a search warrant on SOWARD's phone. SOWARDS advised that he had utilized his cellular telephone so that he could talk to people about looking at their firearms.

### CUSTODY OF THE CELLULAR TELEPHONES

47. The Motorola Cellular Telephone described in Attachment "A" was seized by law enforcement from SOWARDS on September 19, 2024. Since the Cellular Telephone was seized it has remained in law enforcement custody and is currently in the custody of the ATF Charleston, WV Field Office, 300 Summers Street, Charleston, WV 25301.

48. In my training and experience, I know that the Cellular Telephone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of ATF.

## NATURE OF THE EXAMINATION

49.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50. Because this warrant seeks only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

51. Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of Title 18, U.S.C. § 922(g)(9) - Possession of a firearm after a conviction for the misdemeanor crime of domestic violence and Title 18 U.S.C § 922(k)- Possession of a firearm with an obliterated serial number, will be found on the Motorola cellular telephone described more completely in Attachment "A."

52. WHEREFORE, your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Motorola cellular telephone described in Attachment "A" to seek the items described in Attachment "B."


Further your affiant sayeth naught.

Sean McNees
Special Agent, ATF


SUBSCRIBED AND SWORN before me by telephonic means, this 27 day of September 2024.


HONORABLE JOSEPH K. REEDER
UNITED STATES MAGISTRATE JUDGE